# Exhibit 4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

CHERYL BUTLER, ) 3:18-CV-00037-E
)
Plaintiff, )
)
VS. ) DALLAS, TEXAS
)
JENNIFER M. COLLINS, ET AL )
)
Defendants. ) APRIL 24, 2026

------------------------------

TRANSCRIPT OF

SHOW CAUSE HEARING

VOLUME 1

BEFORE THE HONORABLE ADA E. BROWN

UNITED STATES DISTRICT JUDGE

------------------------------

A P P E A R A N C E S

Ezra Ishmael Young
Law Office of Ezra Young
210 North Sunset Drive
Ithaca, New York 14850
Phone: (949) 291-3185
E-mail: Ezra@ezrayoung.com

## C H R O N O L O G I C A L   I N D E X


**April 24, 2026** **PAGE**

Proceedings....................................4

Court in Recess................................126

Reporter's Certificate.........................127


## E X H I B I T   I N D E X

COURT'S EXHIBITS:


| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 1 | Sealed Documents in Appendix 1 | 7 |
| 2 | ECF Document 208 | 19 |
| 3 | Sealed Documents in Appendix 3 | 25 |
| 4 | Sealed Documents in Appendix 4 | 25 |
| 5 | Dropbox Link Screenshot | 40 |
| 6 | Screenshots of Appendices 1-4 Link | 38 |
| 7 | Screenshots of Social Media Post | 42 |
| 8 | Screenshots of Social Media Post | 38 |
| 9 | Sealed Documents in Appendix 2 | 23 |
| 10 | 9/2/25 Social Media Post Screenshot | 48 |
| 11 | 11/21/25 Social Media Post Screenshot | 48 |
| 12 | 2/21/25 Social Media Post Screenshot | 48 |
| 13 | 8/28/25 Social Media Post Screenshot | 50 |
| 14 | 5/6/24 AUSA Press Release | 51 |
| 15 | NACP "Lynching Record for 1920" Report | 61 |
| 16 | 12/6/1920 The New York Times Screenshot | 61 |
| 17 | 7/23/25 Social Media Post Screenshot | 64 |
| 18 | Screenshot of Rebecca Nagle Reposting | 64 |
| 19 | Duke Class of 2025 Photo | 67 |
| 20 | Duke Graduation Celebration Screenshot | 69 |
| 21 | Screenshot of Thurgood at Halloween | 74 |
| 22 | 7/7/25 Social Media Post Screenshot | 76 |
| 23 | 4/4/26 Screenshot of Judge Brown's Phone | 15 |


* * * * *

(P R O C E E D I N G S)

THE COURT: All right. On the record. The Court calls Civil Action No. 3:18-CV-00037-E, styled Cheryl Butler, Plaintiff, v. Jennifer M. Collins, Steven C. Currall, Julie Forrester Rogers, and Harold Stanley.

We're here today on the Court's order to show cause.

And I'll read into the record, in an order dated November 17th, 2025, in ECF Number 205, this Court ordered all briefing relating to recusal and sanctions to be filed under seal. It appears former counsel for Plaintiff, Mr. Ezra Young, may be in violation of this order as of today's date, by publicly posting sealed documents; including, but not limited to, at a website located at www.ezrayoung.com. This website contains documents that are accessible to the general public, potentially in violation of this Court's November 17th, 2025, order.

And so the Court ordered Plaintiff, Mr. Young, to appear today in person for a hearing at 3 o'clock in this court to show cause, one, whether Mr. Young violated the Court's order at ECF Number 205, regarding filing sealed documents; two, whether Mr. Young violated Federal Rule of Civil Procedure 11; three, whether Mr. Young should be held in contempt or otherwise sanctioned.

The purpose of this hearing is to give Mr. Young

an opportunity to show cause why he should not be held in contempt of Court or sanctioned. The only individual or party facing potential contempt or sanctions is Mr. Young.

Mr. Young may file any response to this order by 5:00 p.m. Central Standard time, April 23rd, 2026. Any such filing should be filed under seal. And the Court requested the clerk direct the order to Mr. Young by mail [sic].

And so the Court has a person in court, and I ask them to make their appearance for the record, please.

MR. YOUNG: Yes, Your Honor. My name is Ezra Ishmael Young.

And if I may just offer one correction. I realize Your Honor was reading your order. It -- I think it was just a typo. It identifies me as Plaintiff.

THE COURT: Oh, counsel, former counsel for Plaintiff.

MR. YOUNG: It says that the first time. And then the second time it says Plaintiff.

THE COURT: Oh --

MR. YOUNG: And I realize the Court's super busy. I was just going to --

THE COURT: -- I appreciate that. I will put a little caret on it and I'll go back and fix it.

The Court hereby orders counsel for Plaintiff.

Thank you, Mr. Young.

MR. YOUNG: And, Your Honor, if we could just be a little bit more correct. Former counsel, because I'm not an attorney in this court anymore.

THE COURT: Oh, okay. Well, I'll let you quibble about semantics, okay?

MR. YOUNG: Yes, Your Honor.

THE COURT: Glad to have you here.

Are you Mr. Young, Mr. Ezra Young, one in the same who's been in this Court since your appearance on the case?

MR. YOUNG: Yes, Your Honor. We've met, I think, a couple other times.

THE COURT: Okay. Well, I mean, what I'm asking you is, are you the same lawyer who made the notice of appearance, who's previously been before this Court?

MR. YOUNG: Yes, Your Honor.

THE COURT: Okay. You and I have actually met in person on a prior show cause; fair?

MR. YOUNG: Yes, in, I believe, a status hearing via Zoom.

THE COURT: Well, we met in person on a show cause --

MR. YOUNG: Yes, Your Honor.

THE COURT: Okay. All right. Just making sure we're on the same page.

Any objection to me taking judicial notice of the

filings on the ECF filing system?

MR. YOUNG: What filings, Your Honor?

THE COURT: The docket --

MR. YOUNG: The docket that exists?

THE COURT: Yeah.

MR. YOUNG: No, Your Honor.

THE COURT: Okay. So by consent, I'm going to talk about those. And let me give you kind of a headline for what you can expect today.

MR. YOUNG: If I may, Your Honor, would it be okay if I use the podium?

THE COURT: Sure, when it's your turn. If you'll have a seat for now.

MR. YOUNG: Okay. Thank you, Your Honor.

THE COURT: Yeah. So I'll give just you the lay of how this works.

So what I'm going to do is ask you some questions, talk to you about some things. Learn some information. And then I will hand it to you to make any presentation you'd like; show cause as to why you shouldn't be sanctioned. And we will take it from there.

And so I want to begin by talking about Exhibit Number 1 to my show cause order, which is at ECF Docket 205. And it's an order that says -- I'm going to read it.

It's two paragraphs, Nikki.

Before the Court is Plaintiff Cheryl Butler's motion to withdraw, which seeks withdrawal of local counsel Andrew A. Dunlap. The Court grants withdrawal of Andrew A. Dunlap, ECF Number 204. However, Butler no longer has local counsel. The Court orders Butler to obtain local counsel on or before December 5th, 2025.

And it makes reference to a local rule.

The Court previously ordered briefing related to recusals and sanctions; makes reference to order 203. And in order 205, the Court herein orders, all caps, all briefing relating to recusal and sanctions to be filed under seal. For clarification, the Court is not considering any sanction on Plaintiff Cheryl Butler individually. The only sanction the Court is considering at this time is whether to revoke counsel Ezra Young's pro hac vice.

So ordered, the 17th day of November, 2025.

And so you've read the show cause notice and the attachments. And so before I ask you any questions, I'd like my court reporter to put you under oath, since you're not an officer of the court anymore.

(Mr. Young sworn.)

THE COURT: Have a seat, please.

So I'm going to -- Mr. Young, you own the website www.ezrayoung.com, don't you?

MR. YOUNG: I am pretty sure I -- for -- in

perpetuity, yes.

THE COURT: Okay. Do you have care, custody, and control of its contents? Can you upload and download documents to your own website?

MR. YOUNG: Yes. Sometimes not successfully, but yes.

THE COURT: Well, you have a lot of documents on your website. So I'd say you're pretty successful.

Is it fair to say you're the one who uploads and lets people download?

You act mystified by that question. Should I rephrase it, sir?

MR. YOUNG: No, Your Honor. I was just going through in my head to make sure I've never had a clerk or a student or anyone --

THE COURT: Well, let me ask a better question, then. Because you're being show caused for your behavior, and so let me narrow it down for you.

What I'm trying to find out is, were you aware of the Court's order, 205, ordering you, Mr. Ezra Young, to file any briefing relating to either sanctions or recusal under seal? You're aware of 205, aren't you?

MR. YOUNG: Yes, Your Honor.

THE COURT: All right. And is it fair to say -- let me get my little list out here. Actually, why don't you

give me the list.

What websites do you control? I know we have ezrayoung.com. What else do we have? You're hosted by Squarespace; is that right? Something like that?

MR. YOUNG: Yeah. I -- I'm telling the truth. I'm just a little not tech savvy. Squarespace is like a platform that allows you to edit things. And I think technically there's like a domain registration that's handled by GoDaddy, and all these other things.

THE COURT: And I'm not trying to get that high level. So let me ask a better question.

MR. YOUNG: Yes, Your Honor.

THE COURT: What I'm trying to figure out is, are you morally, ethically, legally, and for all good reasons to be here in this Court, responsible for documents that this Court has ordered, cleanly and clearly, to be filed under seal? If they are out on the internet, in connection with the name Ezra Young, would that have connection to you? Would that be an act that you have done?

So let me just ask you a crazy hypothetical. Let's say you go by the name of something like, I don't know, Ezrasaurus on Facebook. And that you provided a Dropbox link to all of your 20,000 people who pay attention to you on Facebook. And that you provided a link to sealed documents that were guided by my order 205.

And just work with me. If you were to allow members of the public to download, read, take documents that dealt with either sanctions or recusals -- that were properly filed under seal, per this Court's order, on this Court's docket -- if you were to take them out to the internet, and throw them out like candy, would that be in violation of Rule 205?

MR. YOUNG: Does Your Honor mean ECF --

THE COURT: Order -- I'm sorry, yes. Would you be in violation, if you publicly allowed people access -- free access. Not through PACER. Not with this Court's permission -- to sealed documents? Documents this Court has ordered to be filed under seal, whether you like it or not. If you provided plain access to anyone who would click on your Dropbox to those sealed documents, would you be in violation of this Court's ECF Number 205 sealing order, yes or no?

MR. YOUNG: Well, Your Honor, I'm a little confused. Because in the order to show cause, the -- and I'm looking at it right in front of me -- I was asked to show cause based upon three exhibits, and I don't see anything. I see a --

THE COURT: Well, I -- I've got some exhibits for you.

MR. YOUNG: Okay, Your Honor.

THE COURT: Sure. I mean, are you denying that you publicly uploaded these documents? I've got you under oath, just remember that.

MR. YOUNG: Yeah, Your Honor. Again, I'm -- I did a lot of due diligence going through my website, trying to be very specific as to this order.

THE COURT: Well --

MR. YOUNG: I'm prepared to talk about that. I can say, Your Honor, that I do store a lot of my law firm and a lot of my personnel files on Dropbox.

THE COURT: Okay. You're talking about collateral matters. So let me help you with this.

Okay. You're on a show cause for violating a specific order.

MR. YOUNG: Yes, Your Honor.

THE COURT: So in the show cause order, I really try to have it all turnkey.

At your website, ezrayoung.com, when you click on Legal Work, you can click on a bunch of documents. And one of them is Appendix Volume 1, December 2025, all right? And when I click on that -- and I clicked on it this morning.

MR. YOUNG: Uh-huh.

THE COURT: Uh-huh.

MR. YOUNG: Yes, Your Honor.

THE COURT: Yeah. Is that your website?

MR. YOUNG: Yes. And those are filings on the Fifth Circuit's docket, Your Honor.

THE COURT: And some of those fili- -- well, they're not on the Fifth Circuit's docket. They're on your website, aren't they?

MR. YOUNG: Well, no, Your Honor. I believe these are copies of as-filed documents filed in the Fifth Circuit.

THE COURT: Well, if they were filed somewhere else, that doesn't mean they don't violate this rule. If they were filed in the Fifth Circuit, the Fifth Circuit has sealing rules. And I'm not talking to you today about that at all.

What I'm talking to you about is that Ezra Young -- and also at some Facebook and Twitter accounts that we'll talk about. That's all. That's all I'm talking about.

MR. YOUNG: So you --

THE COURT: Let me talk. Let me phrase it for you.

MR. YOUNG: Uh-huh.

THE COURT: All I'm asking about -- I'm not asking about law clerks or any storage devices. What I want to know is, are -- I'm going to have my assistant hand this to you.

When I clicked this morning on Appendix 1 --

MR. YOUNG: Yes.

THE COURT: -- on your website, I found my sealed documents at your site. So I want you to take a look at those and tell me, did you have anything to do with those being posted at ezrayoung.com? And that's a yes or no question.

MR. YOUNG: Is it possible that this is -- one second.

So I haven't seen this version of the document, Your Honor. At the top, it -- there's -- it looks like the ECF, like, automatic stamps. And for documents -- at least any document that I have filed under seal in this Court, when you file it under seal, I think as of last year, when the sealing rules changed, the attorney doesn't get this.

THE COURT: Okay. Well, I'm asking -- I'm not asking about like Fifth Circuit filings. I'm not even talking about filings on my own Court's docket.

What I'm talking about, Mr. Young, just to be clear, and to get us back home here is, at www.ezrayoung.com, this morning -- literally this morning I printed that out. And when I -- let me finish, so I can get us where we need to go, keep us in our lane.

When I clicked on your website, documents this Judge right here ordered to be under seal, those documents -- which I'll represent to you, all of which on

the docket, properly filed, are sealed -- are available to anyone who clicks on them on your website.

MR. YOUNG: So, Your Honor, I'd ask that the Court provide a URL. Because, again, I've never received -- I did e-mail the court clerk, actually, when I was trying to figure out how to serve these --

THE COURT: So let me pause you. Pause, pause, pause. So you want me to provide you a URL to your own website, www.ezrayoung.com?

MR. YOUNG: No, Your Honor. The link that Your Honor says that the Court clicked this morning.

THE COURT: I clicked your web- -- where's my iPhone? Yeah, we're just going to do an in-court experiment so that we can just cut through the nonsense.

MR. YOUNG: Yes, Your Honor.

THE COURT: Okay. I'm going to take judicial notice of my own phone in a minute.

(Brief pause.)

THE COURT: Ezra Young is your personal website, though, correct?

MR. YOUNG: It is, Your Honor. I think I can explain. And this might just be a paperwork snafu.

THE COURT: It's not a paperwork snafu, I assure you.

MR. YOUNG: Okay, Your Honor.

THE COURT: That's what you told Judge Cauthron. When you got caught posting things in her court, you explained it was a misunderstanding and --

MR. YOUNG: Your Honor, I didn't post anything in the Western District of Oklahoma.

THE COURT: I think you did. We'll talk about that a little later, too.

MR. YOUNG: Okay, Your Honor.

THE COURT: Okay. So here's what I'm going to do.

MR. YOUNG: Yes, Your Honor.

THE COURT: I am, right now, opening up my Google, and I'm going to go to -- ready? -- www.ezrayoung.com.

Here we go. And when I go to your website, ezrayoung.com, boom, here's a picture of you. You look just like that, sir. Pops up, Biography.

And I'm going to click on these little three bars right now live. And when I click on Legal Work, oh, wow, look at this. I scroll down. And, look, we've got equal protection, election law, writ of mandamus. And we've got things that were also filed in the circuit, and also filed in this Court. And also uploaded to Twitter and to Facebook, I will tell you. But also on your website.

And so, for example, just real live time, I'm going to click right here on Appendix Volume 1. It says December 2025. I'm going to touch that PDF. Boom, and

163 pages pop up.

Now, whatever you've got in front of you, I guarantee you is this.

MR. YOUNG: And I can tell you, Your Honor, it's not. This has demarcations on it that reflect someone pulled it from this Court's docket in a form that attorneys never get. Because it says: Ex parte, under seal.

Attorneys, at least in this Court, when you file under seal, at least as of, I think, 2025, there's no like link to click to download anything.

THE COURT: Okay.

MR. YOUNG: And so like I -- I literally don't have a copy of this.

THE COURT: So you don't recognize these documents at all?

MR. YOUNG: No. Your Honor, I'm saying Your Honor asked me is this on my website. This set of papers, Your Honor, is not.

THE COURT: Okay. Well, I -- I'm going to take judicial notice of the fact that it is, because I downloaded it today. And I will give it to you, Mr. Young -- I mean, you've been before this Court for incremental efforts at rehabilitation of your constant misbehavior, which has obviously failed miserably. I'll give it to you for standing on business on sanctionable behavior. I mean, you

are the first show cause I've ever had where like, literally, in my own courtroom, I can pull up the file.

MR. YOUNG: But, Your Honor --

THE COURT: Hold on. I don't have a question on the floor. I get that you want to talk about a header or something, but let's take the header off. Let's just talk about the content of stuff.

Like, for example -- give you a good, firm example. I think we will both agree -- let me pull this for you.

For example, ECF Number 208, okay, whatever the header is, whatever the header says, is Defendant's Response to Ezra Young's Response to Order to Show Cause. And it was filed by an attorney named Kim Askew. And in it, she asked for sanctions against you. And she asked that I yank your pro hac vice, and I did.

Would you agree with me that something asking to yank your pro hac vice would be sanctions, yes or no?

MR. YOUNG: If I -- again, that's not noted in the show cause --

THE COURT: I'm asking you --

MR. YOUNG: -- to my recollection. Yes, Ms. Askew filed something. I'll assume that it's 208, I don't recall.

THE COURT: Well, I tell you what. I don't want to play hide the --

MR. YOUNG: I believe it's about three pages long, Your Honor; is that correct?

THE COURT: You're about to see it, sir.

MR. YOUNG: Okay.

THE COURT: I'm going to make this Court's Exhibit 2, just so we're all on the same page.

And I tell you what, don't even fuss about the header, okay? Just look at the content, and then I'm going to ask you a question.

(Brief pause.)

THE COURT: You'll agree with me that deals with sanctions, yes or no?

Where'd you go to law school again?

MR. YOUNG: One moment, Your Honor. I'm trying to read the document.

(Brief pause.)

THE COURT: Do you recognize it? That's a four-page document; you're taking quite some time, sir. It's going to be a long hearing.

You've looked at it now, Mr. Young. And so here's my question for you. Is that a document dealing with sanctions, yes or no?

MR. YOUNG: I believe it's Defendant's response to an earlier order to show cause.

THE COURT: That's the name of it.

MR. YOUNG: Yes.

THE COURT: It asks to yank your pro hac vice, which is something bad that happens. What else would you call that in court? I would call that a sanction. What would you call it?

MR. YOUNG: To remind the Court, I have autism. I was checking to see if Ms. Askew used the word "sanction." That's all, Your Honor.

THE COURT: Yeah. Well, you mentioned that the first time you were in trouble, that you had autism. What you're being show caused for -- and I've got friends with autism. I helped raised someone with autism. Has nothing to do with that. I don't know anybody whose autism makes them violate Article III rules. So whatever you think you have, I promise it has nothing to do with the alleged misbehavior.

MR. YOUNG: Your Honor just said Article III rules?

THE COURT: Yeah, well -- yeah, federal judge rules.

MR. YOUNG: Yes, Your Honor. I'm just making sure we're on the same page. I believe you used a helpful phrase the last hearing. I don't want to butcher this. Something with ships missing each other?

THE COURT: Yeah, you -- we're not ships missing

in the night. I think that's not what's happening here.

So let's go back and -- and let me ask some real pointed questions, okay?

MR. YOUNG: Yes, Your Honor.

THE COURT: Do you recognize that document?

MR. YOUNG: Not this specific one. I was given one, again, without headers. But I believe I received this from Ms. Askew via e-mail at some point.

THE COURT: All right. And that resulted in you no longer being a member of this Bar, correct?

MR. YOUNG: I believe this Court issued a summary order that same day. And then --

THE COURT: Let me back up. I'm not asking about -- like, I'm not wanting to know what time things were made. What I'm trying to do is get to square business. I'm just going to ask you some yes-no questions, where we don't go off in the weeds, okay?

So that -- I will represent to you that should have been filed under seal. That was properly filed under seal on this Court's docket. It is available right now, as I click. And I'm looking at it now on your website, at ezrayoung.com. Whatever hyperlink you want to call that --

MR. YOUNG: I --

THE COURT: -- don't talk over me. Don't talk over me.

And so my question to you is, you're aware of the order that says not to publicly allow documents that are supposed to be sealed to be revealed. You're aware that that's the purpose of the whole order, yes or no?

MR. YOUNG: Your Honor, I --

THE COURT: Just answer yes or no, Mr. Young. These are not difficult questions. Yes or no, you were aware that the purpose of a sealing order is so that things remain contained under seal? That's the point, yes or no?

MR. YOUNG: I'm aware that this Court issued an order directing things to be filed on this Court's docket under seal.

THE COURT: That's not how it works. Okay, so let me ask you this. If I order you to not do something, to not commit some act under my Article III power --

MR. YOUNG: Uh-huh.

THE COURT: -- and you hop on your plane and you go to LaGuardia. Because you're now in New York, are you no longer subject to that rule, because you have moved from the location where the rule was given? Is it your -- are you telling this Court today, with a straight face, that whatever you do on the internet with the Court's documents, as long as you don't violate them, I guess, in this courtroom, that that -- somehow that's not violating the sealing order?

So let me ask this a better way. I'm not going to get you to agree, apparently, that you recognize things or that you know what rules are. So let me just back up and say, this is your website and you do control it, yes?

MR. YOUNG: Yes.

THE COURT: Okay. So let me show you, when I clicked on Appendix 2 today, this morning, I found even more sealed documents. Yeah. Documents that were properly filed here --

MR. YOUNG: I --

THE COURT: -- don't talk over me. Listen, don't talk over me ever. Don't. You have a real problem doing it. Don't do it again at all. Period. I'll let you know when it's your turn to talk, and it's not.

So Appendix 2, I downloaded.

If you would hand that to Mr. Young.

Mr. Young, I represent to you today I downloaded this from www.ezrayoung.com. And it contains documents that, per several of this Court's orders; including ECF Number 205, should have been under seal. And they were publicly available to whoever wanted to look at them on your website.

And all I need to know is, do you deny or admit that? Because I don't want to discuss it. And I'm not going to --

MR. YOUNG: This is not Appendix 2, Your Honor.

THE COURT: Well, what makes it -- what do you think makes it different other than a header?

Well, hang on a minute. Let me click on Appendix 2.

No, that's Appendix 2. I just pulled it up.

MR. YOUNG: If I may, Your Honor?

THE COURT: I pulled it up. So all I'm asking you -- I'm not asking you to agree with it. I'm just asking you, are you in control of that site?

MR. YOUNG: Your Honor, this is not Appendix 2.

THE COURT: Okay. Well, I -- I'm saying that it is, is what I'm saying. You can disagree with that. You can call it Appendix whatever. Is that on your website right now --

MR. YOUNG: No.

THE COURT: -- in any form?

MR. YOUNG: There is a copy of Appendix 2, as filed in the Fifth Circuit. That is what I'm looking at, Your Honor.

THE COURT: Okay. When you say "as filed in the Fifth Circuit," are you saying like it links to PACER?

MR. YOUNG: I'm saying it is the copy of Appendix 2 that I filed in the Fifth Circuit, and that was like spit back out at me by PACER.

THE COURT: Okay. Well, what I'm talking about are my documents, with my header, that are on your website. I don't know what your headers say.

MR. YOUNG: And --

THE COURT: Don't talk over me.

You are here not for anything in the Fifth Circuit. My court orders have been violated on ezrayoung.com. And so if you are here at your show cause hearing acting completely perplexed about documents that I found this morning on your website, I'm not sure how well this hearing's going to go.

So let me go ahead and hand you Appendix 3 and 4, and see if these look completely, absolutely unfamiliar also. Because I will represent to you, as an officer, I guess, of my own court, that these sealed documents I pulled down from your website, too.

And don't worry about the headers. Look at the content. All of these things deal with sanctions and recusals, in this Court's opinion and expertise. So I'll give you a chance to look at them.

MR. YOUNG: So the document that -- or, excuse me. Are these all -- okay. These are all Appendix 3?

THE COURT: I'm handing you what came from your website this morning.

MR. YOUNG: So again, Your --

THE COURT: So pause for a second. Here's what I don't want to hear you do: Chatter about things. So look at it, and then I'm going to ask you some questions. Let me know when you're ready.

MR. YOUNG: I have a question, Your Honor?

THE COURT: No, I'm not entertaining any at this time. I have questions for you.

MR. YOUNG: Okay, Your Honor. Yes, Your Honor.

THE COURT: My question is, were you responsible in any way, header or not, for documents that should have been filed, according to my Court's order, under seal, being publicly available on your website, yes or no? And there's only one answer to that, and it is either the word "yes" or it's the word "no."

MR. YOUNG: Not these documents. These aren't on my website, Your Honor.

THE COURT: Okay.

MR. YOUNG: Wait, Your Honor --

THE COURT: No, no. You've answered my question. You've answered --

MR. YOUNG: You -- you asked me about two different exhibits, and I haven't --

THE COURT: I -- okay. So here's how this works. You're -- I have met you so many times, trying to rehabilitate what you're doing here. So I'm just going to

say some things out loud that need to be said, all right?

MR. YOUNG: Yes, Your Honor.

THE COURT: You are here for several things. Let me tell you what you're not here for, just to set aside concerns.

When I read your briefing, you seem to be very, very, very concerned about this Court retaliating against you for investigations, either real or imagined, in your mind.

So I do want to tell you before we dive in, I'm not aware of any such investigations. So if there have been some and they exist, I promise I don't hold it against you. I think you've been a lawyer about ten years; is that fair? Ish?

MR. YOUNG: 12, I believe.

THE COURT: 12 years, okay. So I'm 51. I became a judge at 30. So I've been doing this a little while, too. I can tell you anecdotally, just to give you a flavor for who your judge is, and kind of how I roll, literally by the time I was 30, I had been jumped in court by a rapist's father, who attacked me because I sent his son to prison for rape.

And I tell you that only to tell you, that's kind of a -- like, that's an interesting story, right? I can't tell you today the name of the rapist, the name of the dad.

And I declined to press charges.

I say that to you to set aside any fears or concerns you may have that some investigation you have launched, past, present, or future, will color how I look at this. Or any of these alleged violations.

What you're here for today has nothing to do with any motion to recuse, or anything you have said or done to the Court. The Court is discussing this with you, because I am concerned at what I see as a disturbing pattern of misbehavior towards lawyers of color, that I see in your actions towards counsel, both opposing and those who preceded you on this case.

And so let the record reflect this is an African American woman judge making these findings. I think that what is going on in this case -- and we're going to talk about some of the e-mails you've sent, and some of the temper tantrums you've thrown, and some of the racial bullying you've done of lawyers who preceded you in the case and opposed you. We're going to talk about that.

The -- I think what's happening here, quite candidly, is you are very intimidated for some reason, Mr. Young, with Black excellence, in light of your White mediocrity. Yeah. Right? You should write that down. I mean, you -- I'm -- you look like a White man, right?

MR. YOUNG: I'm not White, Your Honor.

THE COURT: Oh, okay. What are you?

MR. YOUNG: I'm Latino, Your Honor.

THE COURT: Oh, okay.

MR. YOUNG: I took my wife's name, so it doesn't show as easily anymore.

THE COURT: Well, you are White-presenting; is that fair to say?

MR. YOUNG: I'm fair-skinned, Your Honor, yes.

THE COURT: All right. Will you agree with me that when you accuse Black attorneys of misconduct, when you do it, you have White privilege; fair? I mean, if -- I'm just going to make this up.

If you stood up, let's say, and talked to a Court, and told him that -- told this Court of people that Black lawyers had hidden evidence and lied to the Court, and done all kinds of nefarious things, would that be a misuse of your White male privilege?

(Brief pause.)

THE COURT: I mean, I'm talking to the secretary of the African American, what is it?

MR. YOUNG: The African American Policy Forum, Your Honor.

THE COURT: Okay. That sounds very important. And so I'm guessing that you do lots of things for African Americans; fair?

MR. YOUNG: Yes.
THE COURT: You're an ally, right?
MR. YOUNG: I'm not sure I'd use that word. But, yes.
THE COURT: Well, I mean, I'm just going to keep it real with you.
MR. YOUNG: In the Gen Z parlance, yes.
THE COURT: Okay. I have not paid a lot of attention until recently into the finer points of the discovery disputes in this case. Until you have begged for my notice. And now you have it.
And so I spent the past few days kind of catching up on the shenanigans in this case. And I'll tell you that since you entered in, I think it was like January-something of 2022 -- there's a category on Reddit called The Main Character. Have you ever seen it?
MR. YOUNG: I have not, Your Honor.
THE COURT: Okay. Well, it's about a person who, whatever's happening, it is just all about them.
And so I can tell you, having presided over beaucoup cases, that when you came on to the stage in the Butler v. Collins case, you very much became the main character, Mr. Young. And you immediately displayed what this Court believes is a disturbing pattern of bullying Black lawyers. And I want to talk about some of that.

So, for example, including, but not limited to, last time you were before this Court, I cautioned you, as Black folks would say, about keeping people's names out of your mouth, or calling people out their names. You know what that means.

MR. YOUNG: I do not, Your Honor.

THE COURT: On the African American, what was it again?

MR. YOUNG: The African American Policy Forum.

THE COURT: They don't teach you that? So --

MR. YOUNG: We're a legal think tank, Your Honor.

THE COURT: Okay. Well, I can tell you that -- I'm just going to read from Document 148. And this is you bad-mouthing, we'll just call it, Black Lawyer Number 2, for this case.

All right. In her motion for reconsideration, Professor Butler asked this Court to free her from further collaboration with Black Lawyer Number 2, a former lead counsel in this case whom she terminated the week of January 3rd, 2022. While the overarching reasons for relief are properly elucidated in the merit's motion, the evidentiary support Professor Butler proffers should be accepted under seal.

And so what you say is: Exhibit 1 is a 16-page declaration, with 38 pages of marked exhibits, made by

Professor Butler. This document candidly reveals privileged attorney-client communications, and otherwise -- and here comes the disturbing pattern: Elucidates a disturbing course of conduct for Mr. Black Lawyer Number 2, that ultimately precipitated the undersign's appearance in this matter, and Black Lawyer Number 2's termination...

It also explains in gross details problems with the summary judgment opposition briefings that Black Lawyer Number 2 told this Court could be completed and timely filed.

And then you say: Additionally, Professor Butler asks that the Court also give due consideration to her preference that she not be forced to disclose the extent of Black Lawyer Number 2's mistreatment to opposing counsel -- to you -- and defendants, let alone the general public, while her merit case litigation is live.

So that was Black Lawyer Number 2. And so let me just read something from -- let's pick another Black lawyer whom you bullied and abused, in this Court's opinion.

Oh, here's one. Here we go. I'll do this one.

Okay. This is Document 158-2, Black Lawyer Number 1. And, by the way, I've got to tell you, when I read this, it reads like a very racist Downton Abbey, where you're sort of the Earl of Grantham, and all of the lawyers on the case are your servants, who are Black.

Kim, good morning. At the threshold, thank you for your offer to share contacts with the court reporters. Please do go ahead and ask your paralegal to share those.

I most certainly understand how litigation costs are traditionally covered. To be honest, I'm utterly unclear what Black Lawyer Number 1 paid or didn't pay on this case... all Black Lawyer has told me is that over the two-plus years he worked on this case, he estimates he billed slightly over 100 hours. I think that limited amount of work helps explain much of the mess in this litigation to date.

And so one of the things that you asked opposing counsel, a Black lawyer who does not work for you, to do is: If you could also relay the letters and any responses you might have received to outstanding discovery requests, I'd really appreciate it. I don't see any discovery correspondence to file.

And then later you say: Professor Butler had some serious issues with two sets -- other Black lawyers -- both of whom she terminated for good reason. Unfortunately there are a lot of terrible, parentheses, Black plaintiffs' lawyers out there. This isn't too surprising to me, even if quite disappointing.

And so you have another little temper tantrum: I hear your concern re your belief of prejudice on Defendants

because of the discovery screw-ups. The, quote, file is so piss-poor that it's hard to discern what on earth might have been produced to you, let alone Black Lawyer Number 2's rationales for not producing materials he was directed to produce by his client. I will personally assure you Professor Butler did not intend to withhold discovery.

And so I'll give you another example. Black Lawyer Number 3 files a declaration with the Court:

Mr. Young, Ms. Butler's attorney, accuses me of having a practice and pattern of promising Ms. Butler that I would draft filings in this manner and then not do it. This is not true. Ms. Butler voluntarily e-mailed me several drafts. Most of them 50 pages in length. I relied on Ms. Butler's briefing, first, because she's a scholar in this subject matter; and, second, because she's most knowledgeable of the facts.

Throughout my representation of Ms. Butler, I have been frank, direct, and supportive. Even when she did not make her financial obligations, I continued to represent her. My goal has always been to matriculate her case.

And later on it says: According to the case management log, Mr. Young has only viewed one document since I granted him access. Plaintiff has chosen to expend valuable time filing declarations, in hope of the Court eventually granting an extension to file a response, instead

of using that time to complete the opposition brief. I have made myself available to Plaintiff and her lawyer to assist in doing so. So I'm replying so that the Court can get the complete story.

And so this is Black Lawyer Number 3 saying: I object to the misrepresentations made in this motion, because Plaintiff is committing a fraud upon the Court.

And in another filing, a Black lawyer, whom you abused and bullied, asked to be let off the case, because continuing to stay on would be an ethical violation.

So it's a disturbing pattern of misbehavior. And as a Black judge, it is my duty to call you out on it. And so you've misbehaved throughout this case. You call lawyers who are not Black with honorifics. You call Black lawyers by their first names, despite having been told repeatedly not to do so.

You treat them like they are servants and stupid, and in need of your help. When they don't throw the fight -- I mean, I'm going back to some of your shenanigans. When I was reading the recap of this file, it -- like I learned so much about you, Mr. Young.

You are certainly the main character in everything. But maybe the wildest racial bullying example I would give, is you demanding that opposing counsel reopen discovery when it had closed, and the case had been won for

them, essentially, to their client's detriment. And when they refused to do so, you did what -- I'm not sure what your generation would call it. We would call them Karens and Chads, my age.

Do you know what that is?

MR. YOUNG: I'm familiar with Karen, not Chad.

THE COURT: Okay. Chad is the man version, okay?

MR. YOUNG: Okay.

THE COURT: Yeah. It's someone who calls the manager when they don't get their way. They stomp their foot when the rules are supposed to apply to them, right?

And so I've read lots of e-mails. I'm giving you a little synopses of them, just to kind of give you a flavor. But a disturbing pattern that this Court has seen, since your entry and exit in the case, of you abusing Black lawyers, who don't need your help and don't want your help.

And so I think it needs to be addressed. It needs to be addressed, just like your filings online do.

And I want to ask you a little bit more about that, too. What are your handles on Twitter?

MR. YOUNG: It's probably some version of my real name.

THE COURT: Okay.

MR. YOUNG: I think it may be Ezra I. Young, but I don't recall.

THE COURT: So the last time we had a show cause hearing, do you remember that?

MR. YOUNG: Yes, but I haven't recently reviewed it.

THE COURT: Okay. Well, I'm going to represent to you that before that show cause hearing -- let me find this so I can just hand it to you -- you filed a response to the notice to show cause the morning of the hearing. And I remember that because I -- when I was going back and re-reading the transcript, Ms. Askew had not had the ability to prepare a proper response to rebut your recent filing, because you gave it to her that morning. And you filed it on the Court's docket that morning.

I'm going to ask you a true or false question. Is it true or false that you provided that filing to the press before you provided it to the Court or opposing counsel? True or false?

MR. YOUNG: I don't recall. I don't think I sent it to anyone, other than I believe I e-mailed it to opposing counsel the evening before. And then I believe I finally got unlocked out of PACER the morning of.

THE COURT: So if I had a screenshot of you sending it to a Texas Appellate writer, encouraging them to take a look, before you gave it to opposing counsel so they could be prepared, would that be crazy? Would that sound

familiar at all?

MR. YOUNG: Your Honor, I honestly don't recall.

THE COURT: Okay. I'm going to hand you some more exhibits.

So I'm going to hand you Court's Exhibit 6 and 8. And all I want you to do is tell me if these are your social media accounts.

MR. YOUNG: So Court's Exhibit 8 appears to be an e-mail with iPhone screenshots of what --

THE COURT: Is that -- the screenshot is of your Facebook and Twitter, yes?

MR. YOUNG: Yes, 8 appears to be Facebook and Twitter, or X, whatever it's called today.

THE COURT: Whatever it is now. And when it has the little globe symbol like that, will you agree with me that means that anybody who clicks on it can read whatever you have? That's what the world symbol means, right?

MR. YOUNG: I don't see that symbol, Your Honor.

THE COURT: Well, look on it. It's on one of them.

MR. YOUNG: Okay. I apologize, I don't see a globe.

THE COURT: Okay.

MR. YOUNG: But I'm familiar with that being public versus limited, yeah.

THE COURT: And I don't know how many followers you have. I think when I looked this morning it was, say, 20,000 on one of them. Something like that. Or --

MR. YOUNG: No, Your Honor.

THE COURT: -- well, whatever. Let me ask you this. Will you agree with me that you had documents that were properly sealed on this Court's document linked to a Dropbox, where anybody on Facebook or X could click on them, and download and read sealed documents from my court; yes or no?

MR. YOUNG: No, Your Honor. These both plainly reflect Fifth Circuit filings.

THE COURT: Well, what I'm talking about are not Fifth Circuit filings. I'm talking about if you see little blue hyperlinks, it clicks down to a Dropbox where you have all of the court filings.

Here, let me help you. Here's Court's 5. Yeah, take a look at this. This is an interaction between you and a member of the press, where you give them a little synopsis about how crazy this case -- this case being the case in this court -- and you have a link to, quote, everything in the case. And then a link to Dropbox.

And when I clicked on it, guess what? It was to all my sealed documents.

MR. YOUNG: So, Your Honor, for Court's

Exhibit 5 --

THE COURT: Uh-huh.

MR. YOUNG: -- this shows something that's dated March 2023.

THE COURT: Uh-huh.

MR. YOUNG: I don't believe there's anything that was sealed in March of 2023.

THE COURT: I think it was. I think it was, Mr. Young.

So are you -- remember that you are under oath, and remember -- we will follow up with subpoenas probably after this. And so it behooves you to be honest with this Court at this point.

Are you really trying to tell me with a straight face that you didn't have this Court's documents available to the public on X, on Facebook, on Ezra Young, and some other sites?

MR. YOUNG: So, Your Honor, again, I would need to --

THE COURT: No, you don't need to anything.

MR. YOUNG: -- click these and see what they lead to. But in 2023, I don't believe there was any sealing order.

THE COURT: Okay. The -- how about we just -- you're a master of minutiae. How about we take all of that

to the side and we'll just deal with today. What I just pulled up on my phone just two minutes ago.

I represent to you, whatever the header looks like, I know my own sealed documents, and they are on your website. They also have been uploaded to Facebook and Twitter. And I'll represent that, even though you seem to act like you have no idea about it.

So I just want to ask you a question, a leading question. Are you telling this Court, under oath, that you did not in any way upload or make available documents this Court believes should be sealed, per an order, whether you like it or not, to the members of the public, yes or no? And I just want a yes or a no.

MR. YOUNG: No, Your Honor.

THE COURT: Okay. Before you leave -- actually, I'll give you until probably Monday. I need you to provide, with declaration, a list of all of your social media handles. I believe that you are not being honest with this Court, based on evidence I have before me.

The credible evidence I have seen, that I have pulled up myself, shows you to be in open defiance of this Court's order. That you act like you have no idea about it is very consistent with your misbehavior in this case. Any time you are faced with facts that definitely prove you did something wrong, you get complete amnesia.

So let's move on. Let me ask you about this.

Would you hand this Number 7? Thank you.

And just take a look at it. I don't want you to comment on it. I just want to ask you a couple of questions about it.

So it appears, when I look at that, that you are claiming publicly that a lawyer who was on this case was fired. And so my question to you is, what facts and evidence do you have to support that belief? Not feelings; facts and evidence, do you have that the person mentioned there was fired, like you said on Facebook?

MR. YOUNG: There's no person mentioned here. It says: Troutman took over, as SMU fired DLA Piper law firm.

THE COURT: There's a lawyer's name mentioned there, isn't there? Kim Askew?

MR. YOUNG: Oh, apologies, Your Honor. Who, in turn -- yes, Your Honor.

THE COURT: Yeah, how did you miss that?

MR. YOUNG: Sorry, Your Honor. I woke up at 3:00 a.m. this morning. I'm a little tired. But you're right, Your Honor. I see that at the bottom of this page.

THE COURT: So you posted on Facebook that a woman who you've already -- if you will recall, you have already been in trouble with this Court for maligning, making baseless accusations.

Remember the tenure box game you played? When you couldn't get discovery to reopen, you claimed that Kim Askew didn't give you a tenure box. You claimed it, even though there was absolutely no evidence to support that claim. It was clearly untrue. I made those findings on the record, and you persist in those claims.

You also made all kinds of allegations much like that to prior Black counsel, who competently, by the way, represented Ms. Butler, until your White savior-ness showed up to help us all. To help all the Black lawyers who don't know how to do anything. The case was going fine until you came.

I want to know why. Why would you post something like that about a fellow lawyer? Do you believe that to be true? And if so, why? Who told you that?

MR. YOUNG: I do, Your Honor.

THE COURT: Okay. Who told you she was fired?

MR. YOUNG: I believe it's explained in the brief to the Fifth Circuit, Your Honor.

THE COURT: No, it's not.

MR. YOUNG: It is, Your Honor.

THE COURT: It's not. It's not. You have no facts to support that, Mr. Young, because it's a lie. It's a lie that Kim Askew was fired from anything.

You made it up out of whole cloth. Just like you

lied and said Andrew Dunlap didn't do things, you made it up out of whole cloth. Just like you accused Mr. Robinson, and all the other Black lawyers in this case, of not having provided things, of having lied to the Court, of having been unethical.

Any time you, Chad, don't get what you want, you call the manager. And usually that's the judge or the court of appeals or whatever. But you demand that, if you want something, whether the rules permit it or not, ethics; whether it hurts your client doesn't matter, if Chad wants it.

I mean, I went through and read your e-mails. You are insufferably entitled. And what's odd is you really seem to enjoy walking in to litigation, which I think of as like a chess board, right? Where we're all normally moving around on the chess board in litigation. You know, there's normal conflicts.

And if I could give you a visual for what it was like when you came on this case; that's been lingering since 2018, it's like you walked in and kicked the chess board full of Black lawyers, and just kicked it with your foot and enjoyed watching them fly. And you enjoyed calling people liars, and saying that they hid evidence and they didn't return phone calls.

And I can remember you would demand that they show

up in person and meet you during COVID. And hop on a flight to -- yeah, you did. Yeah, you did. Well, I don't expect you to tell me the truth at this point, Mr. Young. I'm just making facts for the record.

So it is time that someone look into your disturbing behavior. Because I really think the problem here is that your mediocrity is troublesome.

We've had some really good Black lawyers on this case who've done just fine until you showed up. And when you showed up, absolute mayhem and chaos happened. And you accused everybody of all kinds of horrific misconduct.

Now, I've looked through the record, and can see nothing to support any of the claims. Baseless claims you've made on lawyers in good standing. Not like yourself. You had to take an oath because you've been kicked out of this Court for misconduct.

The lawyers you have accused of -- and demeaned their good names, are still in good standing in this Court. Are allowed to reenter in this Court. Don't have to take oaths.

And so I just want to suggest to you, that even though you're in the African American -- what was it again?

MR. YOUNG: The African American Policy Forum, Your Honor.

THE COURT: And you are, at least on paper, such a

great ally for Black people that, in practice, you're incredibly hostile and abusive and a bully to Black lawyers who don't do what you say.

And so I want to let you know that I spot it. I'm going to write up on it. I'm going to ask for it to be investigated in New York. I think that's my duty. Because I think you have a troublesome pattern of coming on down here and misbehaving and showing your behind. And maligning Black lawyers for no reason, other than that they will not obey you in your racist Downton Abbey, Chad.

So I'll tell you, I'm not impressed with your skills as a litigator. I've been very impressed with most of the skills of the lawyers I've seen on this case. Once you exited the stage, the case went on normally, and is going just fine. The problem was the main character, which is you.

And so I think maybe it's time you think about your White-savior-complex-ally thing you have going, that makes you punish Black people who you can't control, like professionals. You are openly hostile, and it's incredibly racist.

And so that it's hypocritical, too, for someone who packages themselves as a woke, progressive, helping Black people in every way they can, it's rich. That at every turn, you're tanking their careers and casting

aspersions on them, that -- as far as this Court can see, and I have reviewed the record at length. I mean, I have been in this saga for some time. Every claim you've ever made has been baseless. Every accusation you've made against every lawyer in this case for shenanigans has turned out to be nothing.

The only person who has ever misbehaved in anything more than general movement on a chess board has been you. You're the only person I have show caused three times. And the last time you were here, I got on to you for maligning Black professionals. And so it's a pattern. It's disturbing. And I'm making that finding on the record.

I also want to ask you a couple of questions.

Have you heard of Spelman College?

MR. YOUNG: The one in Atlanta, Your Honor?

THE COURT: Yes, sir.

MR. YOUNG: Yes, Your Honor.

THE COURT: What can you tell me about it?

MR. YOUNG: Historically Black women's college. I know a few of the former presidents of Spelman College. Historic mission to educate Black women. I don't remember -- the term's like companion school to one of the traditionally male colleges. But it's a --

THE COURT: Morehouse.

MR. YOUNG: -- it's an elite ground to prepare

people. Strong academics, strong research.

THE COURT: I'm going to show you Court's Exhibits 10 and 11, which are posts about Spelman people. And I just want to ask you your interest and connection, if you'll share them with me.

What is your interest and connection with Spelman?

MR. YOUNG: So Court's Exhibit 11 appears to be a Facebook post. And I tagged Beverly Guy-Sheftall. She, I believe, is a former president; and she just celebrated her 50th year at Spelman. So this was re-sharing something she had shared on Facebook.

THE COURT: Okay. Got another question for you. Who is Gary Batton?

MR. YOUNG: I'm sorry, whom?

THE COURT: Gary Batton.

MR. YOUNG: I don't recall. I'm terrible with names. You said Gary Bat- -- Batman?

THE COURT: Batton.

What about this name: Nex, N-E-X, Benedict?

MR. YOUNG: I can't say for certain, but I believe Nex Benedict might have been a child in Oklahoma who died. And I believe it was like a terrible bullying situation.

THE COURT: Do you know who Gary Batton is?

MR. YOUNG: I really don't recall, off the top of my head, Your Honor.

THE COURT: Would you be surprised to find out he's the chief of the Choctaw Nation?

Would you hand this to him, please?

I just am curious about your interest in Choctaws, that's all.

MR. YOUNG: I represented a client years ago who's a member of the Choctaw Nation. I believe I'm still admitted to the Choctaw Bar.

THE COURT: You're not.

MR. YOUNG: Okay, Your Honor. I -- I had a mentee through Columbia that I -- I think she recently left their AG's office.

THE COURT: I thought you were Chickasaw.

MR. YOUNG: Sorry. Sorry, Your Honor. That was my bad. Chickasaw, not Choctaw. I know that they're sister nations. That was -- I misspoke, Your Honor.

THE COURT: Not really. No, they're not. No, they're not.

MR. YOUNG: I believe there's a historical tie. But I believe -- I'm not -- I believe Your Honor is also a -- I can't remember if you're a member or if it's your father. I believe your Choctaw, correct?

THE COURT: Actually, I'm two. I am Choctaw on my mom's side.

MR. YOUNG: Oh, okay. Apologies, Your Honor.

THE COURT: That's all right. Fair to say you are interested in Choctaw things?

MR. YOUNG: Just as a curiosity, learning about Oklahoma and tribal sovereignty, Your Honor.

THE COURT: How many Choctaw women do you know?

MR. YOUNG: Choctaw?

THE COURT: Like that you can say like, oh, Becky? Huh?

MR. YOUNG: I know a few people who I know hold multiple tribal citizenships. I don't recall anyone off the top of my head right now, Your Honor.

THE COURT: Okay. I didn't think so. I -- there aren't that many Choctaws. And what I can tell you is, out of, you know, 675-ish federal judges, there are five Native judges right now. One from each of the Five Civilized Tribes.

So I'm going to hand you Court's Exhibit Number 3. Can you tell me what it means when there's a picture of a Native woman with a red hand on her face? What's that mean?

MR. YOUNG: I believe that symbolizes the missing women and girls of Native citizenship, both in Canada and the United States.

THE COURT: So someone was kind enough to provide me with a screenshot of your Facebook page. And I just wanted to ask you your interest in murdered Choctaw women,

murdered missing Choctaw women.

You don't know any Choctaw women, do you? That's what you said.

MR. YOUNG: No, again, I think I may. Because I know several people with multiple tribal citizenships. I have been interested in the missing and disappeared Native women since I helped my mentor, Kimberlé Crenshaw, write a speech a few years ago at University of, I think, York.

THE COURT: Okay.

MR. YOUNG: She did a speech that the theme was about a report released in Canada. It was elevating the phenomena there, as well as the United States.

THE COURT: Does the name Tanner Dean Washington mean anything to you? I would think it would as a Chickasaw. Not familiar?

MR. YOUNG: Not off the top of my head, Your Honor.

THE COURT: I'm going to hand you Court's Exhibit Number 14.

Would you call being Choctaw or Chickasaw a niche community?

MR. YOUNG: In what respect, Your -- it -- small -- relatively small populations, yes.

THE COURT: How do you define niche? What makes a niche community?

MR. YOUNG: I would want to be very careful when we're talking about the sovereign status of Choctaws and Chickasaws in this nation. I feel like "niche" might be not respecting their sovereignty. Are they relatively small populations, yes.

THE COURT: So have you taken a look at what I've got in front of you there?

MR. YOUNG: Court's Exhibit 14, Your Honor?

THE COURT: Uh-huh. And I'll give you a movie trailer, just to cut to the chase.

MR. YOUNG: Uh-huh.

THE COURT: So there's a case I presided over.

MR. YOUNG: Uh-huh.

THE COURT: I go sit in Oklahoma to help out on cases with missing Indigenous women.

MR. YOUNG: Uh-huh.

THE COURT: And so someone from your tribe, Chickasaw --

MR. YOUNG: Uh-huh.

THE COURT: -- that was investigated by your policemen, the Chickasaw Lighthorsemen [sic], we had a big trial that was written about in your news, my news, all kinds of news, about a girl named Faith Lindsey, whose body was never found. And so that was one of the reasons that I sentenced her killer to life; they never found her body.

MR. YOUNG: I do believe I saw this posted by the Department of Justice, Your Honor, yes. And I -- I forgot that Your Honor presided.

THE COURT: There was a claim in one of your filings that you had been bullied for your religion. I looked through the record high and low, and I didn't see any mention of religion, other than the word Methodist from a party that's no longer in the case.

When was your religious observance mentioned, much less bullied, in this case? That's of deep concern to the Court, so I need to know about that.

MR. YOUNG: So I believe I said that in response to a filing made by Ms. Askew. I think it might have been 208 that I -- based upon my notes.

THE COURT: That sounds right. And I've got 208 in front of me. There's no citation to any facts or record when you say that.

So I couldn't find any evidence to support your claim of her having religiously bullied you. And so I wanted to ask you to tell me where that is in the record at all.

MR. YOUNG: Your Honor, I believe 208 is the document Ms. Askew filed.

THE COURT: It is.

MR. YOUNG: If you give me a moment, I can try to

look at the docket.

THE COURT: Well, I'll look at it. I can represent to you she doesn't mention your religion. Your religion isn't mentioned in the case at all.

So you can look at it. But my question to you is, what -- I mean, you put in a legal filing that opposing counsel religiously bullied you. So I wouldn't think you would need to look for that. I mean, that would be pretty memorable to me.

MR. YOUNG: I believe Ms. Askew made light of a representation I made in a sealed filing, which I said that I prayerfully reflected, as a devout Roman Catholic, on a certain matter.

THE COURT: That wasn't in the record. So let me ask you this. You also accused her of bullying you about your disability. There's no evidence in this record of any disability. At your show cause hearing you mentioned some autism, that obviously didn't keep you from doing your job, and uploading things very successfully.

And so I could not find -- and I have gone through the record with a fine-tooth comb, in preparation for this hearing -- where is there any evidence at all of you being bullied for some disability?

MR. YOUNG: Again, if I recall correctly, Your Honor, Ms. Askew, in what I think was 208, the 3- or 4-page

document, made reference to my disclosure about conferring with mental health providers. And then in the same thing, my disclosure that I had prayed and contemplated an action.

THE COURT: That was bullying?

MR. YOUNG: Your Honor, I don't recall what language I used to this Court. I'm saying that I do recall I said something. And sitting here today, I honestly don't recall if I said that on this Court's docket or the Fifth Circuit's docket. I know I've said it on some court's docket, Your Honor.

THE COURT: So let's go high level. I want to ask you a couple of questions about -- let's just talk the -- let's just talk about the religious bullying part, okay?

Who, what, when, where, why? Who bullied you? How'd it happen? What was said? Give me specifics.

MR. YOUNG: So, Your Honor, again, I don't have the entries in front of me. My recollection is, if this is right for 208 -- no, maybe --

THE COURT: I mean, it's pretty memorable, Mr. Young, if someone bullied you. I mean, I've been called the "N" word. It's memorable.

MR. YOUNG: Well, so, again, Your Honor, I don't recall the language I used. I believe I tried to say something to the effect of Ms. Askew fixated on my religion and my disability in responding to something, and I thought

that was irrelevant to the purpose of what the filing was supposed to be. I don't recall if I used the word bullying, Your Honor.

THE COURT: You accused her of misconduct based on religion and disability. Which, in these parts, is big accusations.

And so my question to you is -- I'm not asking what filing. I'm not asking how you memorialized it. I'm saying you accused yet another Black lawyer of misconduct, and I'm asking what your factual basis is for it. So tell me what it is.

MR. YOUNG: Your Honor, I don't believe I ever filed anything or used the word "misconduct" in --

THE COURT: Bullying.

MR. YOUNG: -- connection with Ms. Askew.

THE COURT: Okay. I'm going to ask you one more word, okay, that I want you to just imagine a really broad umbrella. And I want to ask you -- and remember, you're under oath -- any connection to this case, no matter how small, to this word, I want you to tell me about, all right? Ready for the word?

MR. YOUNG: Yes, Your Honor.

THE COURT: [redacted]

MR. YOUNG: Yes, Your Honor.

THE COURT: What connection does that word have to

this case in any way, no matter how tangential?

MR. YOUNG: To my recollection, there is a recording transcript, where a professor associated with SMU at some point, used the term "it was like they lynched you," I believe was the phrase, Your Honor. And I believe that phrase -- I know that some law professor's blog used that as like the lead of a -- I think of like a report of like an oral argument at the Texas Supreme Court, I believe.

THE COURT: Is that the only connection to lynching in this case?

MR. YOUNG: Well, you -- I know that -- I know that it's a quote --

THE COURT: From --

MR. YOUNG: -- "it's like they lynched you."

THE COURT: -- who said that?

MR. YOUNG: An SMU professor.

THE COURT: Who? That's pretty memorable.

MR. YOUNG: No, I'm really bad with names. I know that she's an African American woman. I believe she was recently like the research dean. She's fairly senior. Oh, I don't -- I don't -- I believe her first name was -- was it Jessica? I can't remember. And if I'm screwing up her name, I apologize.

THE COURT: And so how did lynching come up in this case?

MR. YOUNG: Oh, Your Honor, I believe Jessica Weaver, I believe, is her name. SMU professor.

My understanding is Professor Butler represented in complaints, and said that there were recording transcripts, where this other professor characterized -- I can't remember what particular incident -- as being, it's like they lynched you.

THE COURT: So what does lynching mean to you?

MR. YOUNG: In the United States, the context of lynching refers to usually the horrific and abominable period of Jim Crow, where gangs of White supremacists would murder people for simply existing as Black in our society. Typically targeting Black men with false accusations of rape.

Ida B. Wells studied and elevated lynching. Antilynching campaigns were crucial to the NAACP, and many major Black American civil rights organizations that formed after the failure of reconstruction.

THE COURT: Okay.

MR. YOUNG: And I believe lynching also occurred before or during periods of sla- -- it's a horrible, awful, detestable, and evil thing.

Very specifically, I know that there is a museum of lynching now. I believe it's in Birmingham. And I -- I believe the African American Policy Forum has some events at

the lynching museum coming up.

THE COURT: Okay. The reason I ask is, as a Black person, I can tell you, if in this record there was mention of somebody being lynched, or feeling like they were lynched, I would remember it. I promise it. And so when I read a headline about "it's like you've been lynched," I read through the record. And that's not anywhere in there. Anywhere in there.

MR. YOUNG: I could fill you in, Your Honor?

THE COURT: Well, you don't have to fill me in, because I've read the record. And when I asked you who said it, you can't tell me.

MR. YOUNG: Well, I did recall, as you were speaking, Your Honor. I believe it's -- and I don't want to get her title wrong, because I know that she was like the vice dean at some point -- but Professor Jessica Weaver, Your Honor.

THE COURT: And when did she give a statement saying that in this case?

MR. YOUNG: It's -- my recollection is it's based on a transcript of an audio file.

THE COURT: Okay. Well, the transcripts of the audio file, that game is not --

MR. YOUNG: No, no --

THE COURT: -- let me just pause for a moment. I

think we both know, like, there are no audiotapes to be had at this point, right? Do we both know that?

MR. YOUNG: No, Your Honor.

THE COURT: Okay. You believe -- okay. Well, I've never heard, in all these years of the case, the word lynching. I promise you I'd remember it.

And so when I read a headline -- a sensationalized, very racialized headline that says, "it's like I've been lynched," and it's literally got no connection to this case, I have to ask you, Mr. Social Media, Main Character Chad, White Hero, Savior, Loves to Help Black People Be An Ally, where the lynching in this case came from?

MR. YOUNG: If I'm remembering this correctly, Your Honor --

THE COURT: You should.

MR. YOUNG: -- that the -- the "it was like you were lynched" appeared in one of the merits briefs before the Texas Supreme Court. And I believe that -- I believe -- I can't remember the gentleman's name. I believe at the time he was the dean of, I think, Pepperdine. A western law school. And it might have been like the tax law professor blog or something. He used that as the -- the lead for something.

THE COURT: Will you agree with me there are no

facts, no deposition, and no evidence in this Northern District of Texas Court's record of any lynching?

MR. YOUNG: I believe --

THE COURT: Yes or no.

MR. YOUNG: -- no, Your Honor.

THE COURT: Okay. Where is it?

MR. YOUNG: I believe it was in the summary judgment filings that were struck, Your Honor.

THE COURT: Okay.

MR. YOUNG: So I'm not sure if you --

THE COURT: I read all of it.

MR. YOUNG: -- included --

THE COURT: I read all of it. And even the things that were struck. Because they're all posted on your website. Struck or not struck, everything's on your Dropbox. So I read the whole case from you. And I promise you it's not in there.

And so my question is -- I'm not asking you how it wound up in a brief. I'm asking you where it is in this record. Because a civil rights case already, in the south, is kind of -- you know, we kind of feel some type of way about lynching down here, is what I'll say.

Let me hand this to you. Court Exhibit Number 15 and Court's Exhibit Number 16. I want to talk to you a little bit about lynching.

So my family comes from Holdenville, Oklahoma, all right?

MR. YOUNG: I'm not sure where that is in Oklahoma, Your Honor. But I -- yes.

THE COURT: Okay. Hughes county. I'm going to tell you all about it. Because my father, an African American man who grew up in Holdenville, was raised on stories of strange fruit dangling from trees in Hughes county. And it even made The New York Times. And I gave you a little headline from 1920.

His uncle raised him and told him about what happened to that Negro who dared mess with that old White woman. They threw the Black man in the jail. And 30 to 50 men pulled him out, in a lynch mob, in my dad's hometown. Hung him. Let him sit there for days. And when his head popped off, put it on a spike, like Thomas Cromwell. So we don't find lynching jokes funny down here, sir.

And so I want you to tell me where it is in the record that anybody felt lynched. Because I didn't read that in any depositions. And I sure would remember it. So where is it?

And I don't mean buried in a summary judgment filing, not filed. I mean, what fact and what evidence do you have that anybody anywhere in this case ever said they felt lynched?

MR. YOUNG: I believe the statement was "it was like you were lynched."

THE COURT: Okay.

MR. YOUNG: So it was a characterization by one person of something.

THE COURT: And -- and where is that in the record?

MR. YOUNG: I believe it would appear in the record -- it was a pretrial filing, where we had to identify --

THE COURT: Let me stop you.

MR. YOUNG: -- the exhibits.

THE COURT: Because you're getting real granular. And here's what I'm looking for: Who, what, when, where, why. Who said it? When did they say it? Where was it? And not in some generic filing, with some person whose name you don't know --

MR. YOUNG: No.

THE COURT: -- because Black people all seem to look the same to you. Like I -- what I want to know is, you said in headlines, in this civil rights case, that it was -- there was some lynching. And that's a serious thing to say, coming down from New York, in a civil rights case in the south involving Black people.

So there's no lynching in this case that this

Court has read in this record. And I have read it from top to bottom. And so I'm going to make that finding on the record.

And I don't buy your shenanigans that somewhere, some random Black person, who you conveniently can't recall, said something along the lines of, I felt some type of way about lynching.

That's not now Black people talk. I've never heard anybody casually chat about lynching. And so I -- I don't find that credible. I think you made it up to get a headline.

Would you hand this to him, please?

Couple more exhibits.

I think it was a bad-faith effort to get headlines on this case. And I make a finding there's no lynching in this case. No allegations of it. No mention of it anywhere in this record, other than the headline someone put it in.

MR. YOUNG: Your Honor, I believe it's in one of Professor Butler's amended complaints. I believe it's also an allegation.

THE COURT: It's not in there, I assure you.

MR. YOUNG: Okay, Your Honor. So I'm looking at Exhibits 17 and 18, Your Honor.

THE COURT: So tell me your interest in Creek Freedmen, Muscogee Creek Freedmen. First of all, what is a

Muscogee Creek Freedmen?

MR. YOUNG: The Muscogee Nation that I know of, because I -- I realize some people were removed and some people weren't in Oklahoma -- it's one of several tribes that has been going through a very painful process, through their own sovereign judiciaries, to determine whether, using their tribal sovereignty, they're going to recognize people who were Black and owned as slaves during a period of more sovereignty.

THE COURT: Uh-huh.

MR. YOUNG: And I know that the Cherokee Nation, years ago, their Supreme Court had to decide whether they were members or not outright. And a good number of tribes, especially in Oklahoma, have been going through that process over the last decade.

And the Muscogee Freedmen specifically refer to that group of people. People who were owned, and I -- under their own tribal laws, were not otherwise considered citizens, is my recollection, Your Honor.

THE COURT: Do you know any Muscogee Creek Freedmen?

MR. YOUNG: Of the Muscogee Nation, no.

THE COURT: I just wondered, because you clearly have an interest in it.

MR. YOUNG: Yes. I'm friends on -- on Twitter or